[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties were married on September 19, 1981, at Greenwich, Connecticut. There are two children born to this marriage: Stephanie, born August 14, 1983 and Julia, born September 9, 1986. Each party has resided continuously in the State of Connecticut for at least one year before the filing of CT Page 10395 the complaint on May 13, 1992. The parties have continued to reside in the State of Connecticut during the pendency of this matter and through the hearings on the issue of dissolution. The court finds that it has subject matter jurisdiction on the issue of dissolution and personal jurisdiction over the parties for the entry of an appropriate decree and ancillary orders.
In her amended complaint, the plaintiff sought a dissolution of the marriage on the grounds of habitual intemperance, intolerable cruelty, and irretrievable breakdown. The defendant filed an answer denying the allegations of intemperance and intolerable cruelty, while admitting the allegations of irretrievable breakdown. The defendant filed a cross complaint alleging intolerable cruelty and irretrievable breakdown.
From the evidence presented, it appears that difficulties in this thirteen-year marriage were long standing. The plaintiff complained that the defendant devoted too much attention to his family, drinking with his brother and sending his sister money even though the parties were trying to save money to acquire a house. While she was close to the delivery of her first child, the defendant had intended to go on a camping trip until persuaded otherwise by a counselor. After Stephanie's birth, Mrs. DeTroy perceived an insensitivity to her problems and to the child's problems on the part of her husband, which persisted through Julia's birth.
She testified that the defendant never had a particularly close relationship Stephanie. Some of this she attributes to Mr. DeTroy's work schedules and the fact that Stephanie was a difficult baby. Although his relationship with Julia was better, she recalls his relationship with Stephanie worsened after Julia's birth. Through the years she attempted to have Mr. DeTroy become more involved with the children and family activities and outings. It is her opinion that the defendant showed little interest in the family, so that she and the girls were more and more on their own.
She perceived the defendant as often angry with both her and the children. She complained that he worked long hours and was seldom home.
The defendant conceded that he was distant from the plaintiff and his children and could have been more understanding and supportive. He believed that much of his wife's perceptions CT Page 10396 were caused by her chronic depression.
The defendant experienced business problems, the family appeared to be living beyond its means, using a line of credit against the family home to meet household expenses and to invest in business ventures.
The parties did seek marriage counseling with a professional counselor and later with a parish priest.
Despite the plaintiff's urging, the defendant was reluctant to retrench by selling their second home in Darien and purchasing a more modest house to alleviate their financial problems. The defendant was finally persuaded to make the move, but did not adjust well to the new home.
There also was disagreement about the plaintiff's decision not to return to full-time employment with her former company and her decision to resume schooling.
While the plaintiff had problems in her relationship with the defendant's family, the defendant found the same problem in relating to the plaintiff's family. He believes that his mother-in-law was instrumental in causing an abuse complaint to be filed with the Department of Children and Youth Services by Dr. Chapar. That complaint and the efforts to resolve the issue raised therein has proven to be the primary factor in the extended litigation involved in this suit.
In early 1992, the parties and the children began consultations with Dr. George Chapar, a psychologist. After several sessions, Mrs. DeTroy determined that it would be best to initiate the dissolution action.
Both parties have testified that the marriage has broken down irretrievably and the court finds that to be so. A decree of dissolution of the marriage may enter on that ground as requested in the complaint and cross-complaint.
Although both parties alleged intolerable cruelty and the plaintiff alleged habitual intemperance as causes for dissolution, there was little effort to present other than subjective evidence on these grounds, except as the testimony related to the issue of custody and visitation. Neither party requested a dissolution on these grounds in his or her claims for CT Page 10397 relief. "Where more than one ground for a divorce is claimed and one alleged ground is proved, it is immaterial whether or not an additional statutory ground or grounds may also exist."Hollingsworth v. Hollingsworth, 180 Conn. 212, 214, at fn. 2,429 A.2d 463 (1980), citing Christoni v. Christoni, 156 Conn. 628,629, 239 A.2d 533 (1968). This is especially so where the usual reason for pressing alternative statutory grounds — the issue of asset distribution — is a secondary issue between these parties.
In considering the additional criteria established by General Statutes § 46b-82 and General Statutes § 46b-81, the court makes the following findings.
The plaintiff wife, was born on October 20, 1955, and is thirty-eight years of age. The defendant husband, was born on April 8, 1953, and is forty-one years of age. Both parties are in reasonably good physical health.
The plaintiff is a college graduate, having received a degree from Brown University with a major in languages. At one time she was employed as an administrative assistant and translator at Pechiney Corporation, earning approximately $21,000.00 a year. She worked full time until Stephanie's birth. After that she continued to work on a part time basis, both outside the home and at home, doing translations. She has worked periodically at the New Canaan Nursery School and the YWCA in Darien. In 1987, after returning to her former employment at Pechiney, she concluded that her skills as an administrative assistant and as a secretary were obsolete because of the technological changes that had occurred since her departure in 1983.
She left the business ranks and, in 1988, began taking courses at Fairfield University toward obtaining a teaching certificate. To complete her teaching certification program, she has been matriculating on a full time basis during the spring semester of 1994. She expects to receive state certification in three fields, French, German, and English as a second language. After completion of her thesis, she anticipates receipt of her Masters Degree from Fairfield University in December of 1994. She had, during this period, tutored students in French and German and taught an adult education course in Italian in the evenings.
The Defendant received a Bachelor of Science Degree in CT Page 10398 accounting from the University of Connecticut in 1975. He is a CPA and has been employed continuously since graduation. He was employed for a time by U.S. Surgical where his highest annual salary was $50,000.00. Since 1985, he has been employed as a vice-president for finance by the Dataline Corporation of Wilton, a company that specializes in computer software. He has some stock interest in that corporation for which he fixes a value of $49,200.00.
In his financial affidavit, the defendant reports his current wages as approximately $80,000.00 per year. The plaintiff, however, notes that the defendant's 1993 base and bonus compensation from Dataline, when including group medical insurance benefits and payment by the company of the tax on the medical benefits, totaled $90,100.54. Additionally, he received distributions of $3,750.00.
Until recently, the primary financial asset of this family was a home located at 59 Benstone Street in Stamford. This property has been sold. The proceeds left from the sale, $16,400.00, was placed in escrow. From this escrow account, $3,170.00 has been paid to the Federal Government to cover the 1993 taxes and $1,644.00 paid to the State of Connecticut for 1993 taxes.
This home was the third house purchased by the parties during the marriage. The first home was acquired by the parties from a combination of their savings, a gift of approximately $10,000.00 from the wife's parents, a loan of approximately $5,000.00 from the husband's parents, and the tax benefit generated by the donation of two paintings owned by the plaintiff. These paintings were gifts to the plaintiff from her father, Lester Johnson, an artist of some reputation and a retired professor of art at Yale University.
The second home was purchased from the proceeds of the first home, combined with the tax savings or refunds generated by the donation another painting gifted by the wife's parents, together with a balloon purchase money mortgage from the sellers. The Benstone Street property was purchased by the parties with the proceeds from the second home sale.
The Defendant holds an interest in Dataline Corporation, which is a small privately held company. He has assigned a value of $49,200.00 to this stock, noting, however, that he has pledged CT Page 10399 a security interest in these shares to secure a loan of $15,000.00 from the company's president. The defendant has fixed his valuation on the theoretical net book value of the corporation. The defendant also notes that his interest in the corporation is not a liquid asset which could easily be converted to cash. He claims it represents his life work and is of only limited value to anyone else.
The evidence does indicate that the stock in the Dataline Corporation was purchased with funds withdrawn an equity line of credit on the parties' second home. The defendant took title to the Dataline stock in his name individually, although the home was jointly owned and the equity line was ultimately paid from the proceeds of sale of the home.
While the defendant values the stock at $49,200.00, the plaintiff asserts that such valuation was based upon the 1992 company numbers. The plaintiff asserts that, in assessing the current value of this asset, it should be noted the defendant's 3.75% share of ordinary business income as reported on his K-1 from Dataline has increased from $8,681.00 in 1992 to $14,724.00 in 1993, an increase of almost 70% Dividends paid on the Dataline stock increased from $3,750.00 on February 5, 1993 to $5,625.00 paid in January of 1994.
The plaintiff is in possession of four paintings created by her father. These works have been identified by title as "Portrait of Leslie", "Six Heads", "Street Scene", and "Bathers #7." Both agree that the latter two paintings were gifts to the children, Stephanie and Julia, from their maternal grandfather. Both parties also agree that the donation of several paintings received during the marriage effected a tax savings or refund which benefitted [benefited] the family in the purchase of their earlier homes.
The defendant claims that the paintings "Portrait of Leslie" and "Six Heads" were acquired during the marriage and should be considered as marital assets. An appraiser familiar with the works of Lester Johnson, Mr. Burr Chernow, fixed the fair market auction value of these painting at $8,000.00 and $7,000.00 respectively. He did suggest that in a gallery setting, each might garner as much as $12,000.00.
The defendant also maintained that the plaintiff received additional paintings during the marriage, but was not at all CT Page 10400 specific about the paintings and the circumstances of the gifts. The defendant points to the evasiveness of the plaintiff's parents in responding about gifts of paintings to their daughter in support of his claim that the plaintiff had received other paintings during the marriage. The evidence that would warrant the court to infer such gifts is lacking and the court concludes that the only gift paintings in the possession and control of the plaintiff are those identified by the appraiser Chernow.
The plaintiff contends that these assets, the two paintings, were acquired by her before the marriage. Nevertheless, the painting entitled "Six Heads" appraised with an auction value of $7,000.00, assuming acceptance for auction and sale in the current market, at best might generate $5,600.00 after the auction commissions and costs, according to Mr. Chernow.
The plaintiff asserts that the second painting, "Portrait of Leslie", is a particularly personal work of uncertain marketability, given to her on her 16th birthday.
An examination of the financial affidavits submitted by the parties shows that each claims expenses exceeding income. Each also claims substantial debt.
The plaintiff alleges a net weekly income of $680.00. This figure includes the $650.00 being paid to her by the defendant for support pendente lite. She alleges the weekly expenses for herself and the children to be approximately $1,250.00.
The defendant's affidavit, adjusted to a weekly basis, shows a gross weekly income of $1,564.00 and a net income of $1,121.00. He claims weekly expenses of $1,325.00, including the pendentelite payment.
The plaintiff listed assets of $18,415.00, but this did not include a valuation for the gifted paintings. Her financial affidavit shows liabilities at $77,933.00. The defendant indicates assets of $61,900.00, including his shares in Dataline. His financial affidavit shows liabilities of $59,000.00.
Neither affidavit took into account the full amount of claimed attorney fees, fees for the attorney representing the guardian ad litem, and the balance of fees claimed by Dr. Chapar.
Counsel for the plaintiff has submitted an affidavit for CT Page 10401 total fees of $52,801.95; counsel for the defendant has submitted an affidavit indicating fees in excess of $43,000.00. Counsel for the guardian ad litem has submitted a compromised claim for a balance of $5,000.00. Dr. Chapar indicates a balance due to May, 1994 of $11,083.00.
The defendant asserts that a substantial portion of his indebtedness has been incurred in the attempt to address the suggestion of improper conduct with the children and possible sexual abuse of a daughter. The issue stemmed from a report of suspected child abuse made to the Department of Children and Youth Services under the provisions of General Statutes § 17a-101(b) by the children's psychologist, Dr. George Chapar. The report was made orally on November 16, 1992 and in writing on November 20, 1992.
The circumstances leading to the filing of the report has been described by the plaintiff and Dr. Chapar in testimony.
The children had been in therapy with Dr. Chapar since the Spring of 1992. Mrs. DeTroy, anxious about behavioral changes and nightmares experienced by the children, requested a referral to a therapist by their pediatrician, who suggested Dr. Chapar.
Dr. Chapar worked with the girls and the parties to deal with the issues created by the dissolution proceedings and the family separation. A schedule of visitation was arranged with Mr. DeTroy seeing the children one night a week for dinner and on Saturday. According to the plaintiff and Dr. Chapar, the children began to manifest resistance to the visits. The children complained that their father had lost them on a Circle Line Cruise, had sometimes sworn at them, and was often angry with them. In November of 1992, Stephanie refused to visit with her father. When Mrs. De Troy decided not to force Stephanie to visit and told Julia she could go by herself, Julia's reacted by sobbing intensely. Mrs. DeTroy took her to see Dr. Chapar, who described her as reacting in an uncharacteristic tantrum. After that session, Mrs. DeTroy took her to the pediatrician, thinking she might be physically ill.
The scheduled visitation was cancelled. According to an application filed by the plaintiff seeking a protective order, when the plaintiff spoke with Stephanie, asking why Julia was so upset about the potential visit, Stephanie's response was that maybe Daddy was torturing Julia when he took her in the bedroom CT Page 10402 alone and closed the door, every time they visited.
The plaintiff contacted Dr. Chapar and informed him of Stephanie's statements. After meeting with Julia and Stephanie and reviewing Julia's art work which Dr. Chapar believed disclosed possible phallic symbolism, Dr. Chapar made his report of possible sexual abuse to Department of Children and Youth Services.
A formal investigation was conducted by the Department of Children and Youth Services through the Child Guidance Center of Southern Connecticut. The conclusion drawn in the two reports prepared by two independent investigators was that there was no evidence which could substantiate suspicion of sexual abuse by the defendant.
The children have been represented in these proceedings by a guardian ad litem, attorney Bobbi Silver. In addition, a court has appointed Elizabeth T. Sharpe, Esq., as counsel for the minor children.
On January 4, 1993, the parties filed a stipulation with the court agreeing that a determination had been made that there was no evidence of sexual abuse of the minor children by the father.
In an attempt to resolve the issues of custody and visitation, the parties submitted to an evaluation of the family by the Yale Child Study Center. The Center issued a report on May 14, 1993. The report, signed by E. Kirsten Dahl, Associate Professor of Child Psychoanalysis, recommended that the father should have appropriate visitation, because it was important that the children feel it is possible to love both parents and to have an emotionally significant relationship with each parent that does not compromise their tie to the other parent. Neither girl should feel she must choose one parent over the other. Dr. Dahl suggested that there be a temporary continuance of supervised visitation in order to help reduce Mrs. DeTroy's anxiety.
The report indicated that the defendant "is able to hold his personal anguish in check in the presence of his daughters and to remain appropriately emotionally available to them. Mrs. DeTroy continues to be very angry and upset with Mr. DeTroy; she does not appear able to protect her daughters from her painful feelings about Mr. DeTroy, nor does Mrs. DeTroy appear able to support her daughter's relationship to their father." CT Page 10403
It was suggested that Mrs. DeTroy enter individual psychotherapy to assist her in dealing with grief over the breakdown of her marriage and help her find ways to support her daughters' relationship with their father.
It was further recommended that Dr. Chapar has become compromised by his involvement in the fight over visitation and that other counselling ought to be provided the children.
Dr. Dahl testimony at trial reiterated her report conclusions.
Because there continued to be difficulties with arranging for baby sitters to attend the supervised visitations (Attorney Sharpe occasionally acted in the position of "supervisor" for visitations) and because the children were still manifesting hostility to some visitations, the parties and all counsel, agreed to have the child psychiatrist, Dr. Babette Caraccio act as a "facilitator." She began seeing the children on a regular basis since August, 1993.
Dr. Caraccio testified in a hearing before this court on November 30, 1993. Doctor Caraccio was of the opinion that the children had not been sexually abused nor had they been physically abused. She did feel that the children were emotionally suffering from the extended dissolution proceedings and the inability of the parents to negotiate and resolve even the issue of visitation. At that time, she suggested a transitional period calling for supervised visitation with the presence of a baby sitter who should be phased out until about the middle of January 1994 and, at that point, there ought to be normal, unsupervised visitation.
In addition, the parties and the children submitted to a psychological examination by the psychologist, Paul Turner. The report was filed with this court on January 25, 1994, when Dr. Turner testified. In his opinion, the children's perception of their father have been adversely impacted and distorted by their mother's strongly negative opinions about him. The fear the children may manifest about their father "mirror their mother's feelings, rather than any discernible direct experience with him." He concluded that "while there appears to be no reason to restrain Mr. DeTroy's visitation with his children, [their] present beliefs and fears indicate the necessity for a gradual CT Page 10404 and therapeutically guided increase in the frequency, duration and liberty of their visits with their father."
Through the Spring of 1994, this court was informed of difficulties in arranging visitation and of the children's occasional outbursts of anger and resentment towards the father. Although Dr. Chapar has continued to assist as the girls' therapist and to discuss with them methods of dealing with their repeatedly expressed fears and concerns and the importance of a relationship with their father and despite two years of therapy, the issue of visitation was still unresolved.
Because of the expense of utilizing professionals such as psychologists and Psychiatrists to facilitate a resolution of the issues of custody and visitation and because of the defendant's unwillingness to use the assistance Dr. Chapar (which, under these circumstances can be understood), this court recommended that the parties and counsel approach the Family Center in Greenwich, Connecticut (where the plaintiff and the children now reside) for assistance in facilitating visitation.
Both the parties have recently been working with Adele Wenning, MSW, of the Family Center and have reported that the girls are reacting well to local visits with their father, unaccompanied by any sitter. Both of the parties have indicated that they would continue working with Ms. Wenning until she feels that her intervention would no longer be necessary.
The court has detailed the energy, effort and extent to which the parties and counsel have devoted their attention to the issue of custody and visitation, since these issues have consumed most of the court time devoted to this litigation.
The parties have submitted their claims for relief and counsel for the children has submitted her recommendations on behalf of the children. The court has reviewed and given consideration these claims and arguments.
The court enters the following orders:
1. STATUS:
A dissolution of this marriage may enter on the grounds of irretrievable breakdown. CT Page 10405
2. CUSTODY:
Custody of the minor children is awarded to the plaintiff wife. This award is subject to the conditions and limitations set forth in the provisions for visitation, unless and until those provisions are modified by an order of the court or by written agreement of the parties.
The court has given substantial consideration to the defendant's request that joint legal custody be granted. The defendant has indicated that in terms of basic decision-making for the children, there has not been significant disagreement.
However, this is not a situation where a marriage is dissolved by an amicable agreement that it has not worked out. The patent animosity of the parties to one another, the differences in family background, culture and personality is such that the goals for which joint custody is usually ordered would be unlikely to be achieved. For example, it is difficult to perceive that the parties would agree on the utility of Dr. Chapar continuing as the childrens' therapist.
3. VISITATION
A. It is ordered that the parties will continue working with Adele Wenning of the Greenwich Family Center to reduce any anxiety that the children have and to work towards an ongoing and regular expansion of that visitation in the immediate future. The parties are ordered to continue to see Ms. Wenning or her successor at the Greenwich Family Center in accordance with her directives and suggestions. It is also ordered that in accordance with any directive or suggestion of Ms. Wenning, the parties will see to it that the children are available to see her on a regular basis. It is further ordered that the cost of these visits, beyond what is covered by insurance, will be paid seventy percent (70%) by the Husband and thirty percent (30%) by the Wife.
B. The Court will continue to retain jurisdiction over the issue of visitation and will have the ability to modify visitation as it moves forward and in accordance with the recommendations of Ms. Wenning and the Greenwich Family Center.
C. The duration, locations and frequency of the visitation should be expanded or limited in accordance with the CT Page 10406 best interest of the children as determined by Ms. Wenning.
D. Beginning as soon as deemed feasible by Ms. Wenning and with her approval, but in any event no later than January 7, 1995, there should be overnight visitation with the father in accordance with the following order:
Every Wednesday from 5:00 p.m. to 8:00 p.m. and every other weekend from 5:00 p.m. on Friday until 5:00 p.m. on Saturday, or from 5:00 p.m. on Saturday until. 5:00 p.m. on Sunday. On the weekend when there is not overnight visitation, there will be visitation on Sunday from 12:00 noon to 5:00 p.m. The goal should be to extend such visits to two nights on alternate weekends.
In addition, to these visitations, the following schedule is established:
 ODD YEARS WITH FATHER EVEN YEARS WITH MOTHER
 New Years Day Presidents Day Winter Vacation Memorial Day Labor Day Thanksgiving Day Christmas Eve (until 10:00 a.m. Christmas Day)
 EVEN YEARS WITH FATHER ODD YEARS WITH MOTHER
 Martin Luther King Day Spring Vacation Easter Day Independence Day Veteran's Day Christmas Day (from 10:00 a.m. Christmas Day)
SUMMER VACATION
 Two (2) weeks during the summer with the Father, normally the CT Page 10407 last two weeks in August
OTHER DAYS
 Father's Day with the Father Mother's Day with the Mother Father's birthday with the Father Mother's birthday with the Mother Some time with the children on each of their respective birthdays
E. These orders are subject to modification by the court for good cause shown. In the event Ms. Wenning or the authorities at the Family Center deem it necessary to withdraw from working with these parties, she and they are requested to notify the Family Relations Office of the decision and the factors involved.
3. CHILD SUPPORT
The defendant is ordered to pay the sum of $420.00 per week child support. This order is based upon the premise that the plaintiff is not presently employed and is presently unable to contribute significantly to economic child support. In the event the plaintiff becomes employed, an application for modification in accordance with the child support guidelines will be considered.
4. ALIMONY
A. The defendant is ordered to pay to the plaintiff the sum of $230.00 per week as alimony until December 31, 1999, or until the plaintiff cohabits with another, or until the plaintiff remarries, or until the plaintiff dies, whichever event first occurs. This time limitation takes into consideration the duration of the marriage and the education and employment skills of the plaintiff.
The plaintiff's earnings of up to $10,000.00 per year shall not be considered a substantial change in circumstances. If the plaintiff earns in excess of $10,000.00 per year the defendant shall the right to petition for a modification of alimony.
B. That the defendant pay the additional sum of $1.00 per year alimony to the wife until the youngest child reaches the CT Page 10408 age of 18. This alimony shall be modifiable by the plaintiff if she is medically disabled and such disability affects her ability to continue her usual employment.
5. DIVISION OF PROPERTY
A. The plaintiff is awarded the remaining balance of the escrow funds from the sale of the marital home.
Although the court recognizes that the defendant's Dataline stock was purchased with marital funds derived from credit lines against the family residence, because the stock would not be readily convertible to cash and because it represents the defendant's interest in a company from which he draws his salary to meet the obligations being imposed by the court, this court has determined that he may retain those shares in his own name.
The plaintiff may retain ownership of the two paintings which have been put into issue.
6. INCOME TAXES
A. The defendant shall indemnify and hold the plaintiff harmless from any liability on income tax returns previously filed by the parties, except with respect to any liability related to the plaintiff's income from employment.
B. So long as he is the sole payor of child support, the defendant shall be entitled to the tax exemptions for the children.
7. MEDICAL INSURANCE
A. The defendant shall continue to maintain the current medical insurance or its equivalent for the benefit of the parties' two children until each such child reaches the age of eighteen years.
B. The parties shall share the unreimbursed portion of the children's medical, dental, optical, psychiatric, psychological, orthodontic and prescriptive expenses, including deductible, on a 30% (wife)-70% (husband) basis. All such payments shall be made promptly when incurred and due.
During any period that the plaintiff is employed on a full CT Page 10409 time basis, such expenses shall be shared in proportion to the parties' respective incomes.
C. The defendant shall assume the premiums for the conversion of the plaintiff's existing coverage under COBRA, until such time as she has health insurance available through employment.
8. LIFE INSURANCE
The defendant maintain $100,000.00 life insurance with the plaintiff as the beneficiary for so long as he is obligated to pay alimony to her. Thereafter, he shall maintain the same amount of insurance with the children as beneficiaries until each reaches the age of eighteen. Upon the plaintiff's request he shall provide ongoing verification of such coverage and beneficiary designations.
9. PAST DEBTS
A. Dr. Caraccio and Dr. Chapar
The parties are directed to pay the remaining balance on the bills of these professionals as follows: the defendant shall pay 70% and the plaintiff pay 30% of the outstanding balance on the bill of Dr. Caraccio; the defendant is directed to pay the 1992 balance on the bill of Dr. Chapar, the plaintiff shall be responsible for the remainder.
These bills shall be paid with due dispatch, taking into consideration the present financial circumstances of the parties. The court believes the bills should be paid by the end of the first quarter of 1995.
B. Pediatrician, dental, optical
The defendant is directed to assume responsibility for the payment of any outstanding balances, based on the assumption that the plaintiff has paid all of these costs without contribution by the defendant since January 1993.
C. Dr. Turner
The defendant shall be responsible for the payment of the remaining balance. CT Page 10410
10. LEGAL FEES
Each party shall be responsible for his or her respective legal fees. The remaining (not already subject to prior court order) fees for the children's guardian and counsel shall be paid 70% by the defendant and 30% by the plaintiff.
NIGRO, J.